**FREEDOM LINE INCORPORATED, a Panamanian corporation, Libelant and Cross Libelant,**

**Manuel Diaz Losada and Bahamas Line, S.A., Intervening Libelant and Cross Respondents,**

**Brewer Dry Dock Company, Intervening Libelant,**

v.

**The VESSEL GLENROCK, her engines, tackle, machinery, furniture, appurtenances, etc. and Hudson Shipping Corporation, a Panamanian corporation, her owners, Respondents.**

No. 66–49–Adm–CA.

United States District Court
S. D. Florida,
Miami Division.

March 9, 1967.

Frank J. Marston, of Fowler, White, Collins, Gillen, Humkey & Trenam, Miami, Fla., for libelant.

Turner & Patterson, Miami, Fla., for Manuel Diaz Losada.

Raymond T. Greene, Miami, Fla., for Bahamas Line, S.A.

James L. Armstrong, III, of Smathers & Thompson, Miami, Fla., for Brewer Dry Dock Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ATKINS, District Judge.

This cause came on for trial before me and at the conclusion thereof all parties submitted proposed findings of fact and conclusions of law. These proposals and all memoranda in support of the positions of the respective parties have been carefully considered. Thereupon, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. At the time of filing this libel, Freedom Line Incorporated, a Panamanian corporation, was the holder of a note, secured by a mortgage on the vessel S.S. Glenrock, executed by Hudson Shipping Corporation as owner thereof, (hereinafter "Hudson") dated December 3, 1963, recorded under the laws of the Republic of Panama. The balance as of December 2, 1966 was in the amount of $10,900 plus interest, insurance, costs, expenses and attorneys' fees. The mortgage, at such time was and is now in default and it was necessary for libelant to engage the attorneys who filed the libel in this cause to foreclose such mortgage.

2. Intervenor Brewer Dry Dock Company (hereinafter "Brewer") is a New York corporation maintaining its principal place of business in Staten Island, New York. It is a company which owns and operates a dry dock and is engaged in the repair, renovation and furnishing of supplies to vessels.

3. Intervenor Bahamas Line, S.A. (hereinafter Bahamas) is a Panamanian corporation engaged in the shipping business in Miami, Florida.

4. Intervenor Manuel Diaz Losada (hereinafter Diaz) is engaged in the business of ship repairs, primarily on a contract basis. He frequently subcontracts portions of his work to others.

5. Though the mortgage specifically required it, a certified copy of the mortgage was not placed among the vessel's papers or a "Notice of Mortgage" posted in the chart room of the ship.

6. In May, 1964, at the request of R. A. Nichol and Co. (hereinafter "Nichol), as agents of the owner of the Glenrock who were authorized to act in her behalf, Brewer furnished necessary supplies, materials, services and repairs to and aboard the vessel for a total value of $23,754 on the credit of the vessel. The sum of $23,754 represents a reasonable charge for such services, materials, supplies and repairs. The balance due on said account was $15,754 as of March 15, 1966 and such remains outstanding and unpaid. Such necessaries were furnished at Staten Island, New York.

7. Shortly after March 12, 1966 Brewer engaged counsel in New York to collect the account owed it for work on the Glenrock. Previous efforts to collect the account had been unsuccessful. The whereabouts of the vessel was not determined until June 8, 1966 when Brewer received information from Nichol that the Glenrock was to be sold by the United States Marshal for the Southern District of Florida. After a necessary substitution of counsel, Brewer filed a Petition to Intervene in these proceedings on June 30, 1966.

8. Any delay by Brewer in asserting its claim against the Glenrock has not subjected any of the parties in this cause to a disadvantage in asserting or establishing any claim against the Glenrock or any defense to the claim of Brewer.

9. Tropic Carib, S.A. (hereinafter "Tropic") is a Panamanian corporation of which the libelant Diaz was one of the four stockholders and its secretary on January 5, 1966. On that date, Tropic

authorized Bahamas to act as its agent in the purchase of the Glenrock from Hudson Shipping Corporation, likewise a Panamanian corporation. Bahamas also agreed to lend Tropic funds to purchase and repair the vessel. As additional security for the loan the stockholders were to pledge their stock as collateral. After acquiring the Glenrock, Bahamas was to act as operator and manager of the Glenrock.

10. Bahamas agreed to purchase the Glenrock "as is" from Hudson by a Memorandum of Agreement dated February 10, 1966. Prior to executing that agreement, two of the four stockholders of Tropic went to San Juan, Puerto Rico to inspect the vessel where it had remained in port for some time. The vessel was in need of repairs and was then "out of class". Jhonar Shipping Corporation (herinafter Jhonar), acting through Rogelio Jhones, was engaged by Nichol to act for the owner of the Glenrock in the sale and delivery of it to Bahamas at Miami. The authority of Jhonar to act as an agent for the owner was limited by a letter dated February 17, 1966 from the owner to Jhonar. Such letter provided, inter alia, as follows:

"We refer to our telephone conversation of February 16th, at which time we requested that you act as Agents on our behalf in connection with the sale and delivery of the M/V 'GLENROCK' to Bahamas Line, Ltd. This delivery is to become effective, by agreement, on vessel's arrival at the Pilot Station, Miami and the Terms of the sale are, by agreement, Cash, on delivery $45,-000.—less any advances, vessel to be accepted 'as is—where is'. All other terms and conditions are included in a Memorandum of Agreement dated February 10th, 1966, a copy of which is in the possession of Messrs. Bahamas Line, Ltd."

The scope of Jhonar's authority to act on behalf of owners was disclosed to Bahamas.

11. Prior to the arrival of the vessel in Miami for delivery to Bahamas, certain expenditures were made by Bahamas in San Juan, Puerto Rico in order to discharge alleged claims against the vessel so that she might sail. Such expenditures were made at the request of Jhonar without the knowledge or consent of the owner. Such advances were made in contemplation of the sale and not on the vessel's credit.

12. The Glenrock arrived in Miami from Puerto Rico at the Pilot Station on February 18, 1966. At that time there were wages owing to the crew of the vessel. Payment thereof was made by Bahamas as authorized by the owners in their letter of authority to Jhonar dated February 17. A total of $8309.10 was disbursed for this purpose by Bahamas but at least $2334.30 of this sum was paid to the master of the vessel. Such disbursement was made in contemplation of the sale but Bahamas also received an assignment of the above wage claims in the amount of $3549.16. The original crew of the said vessel was signed off the vessel and a successor crew obtained by Bahamas acting as owner of said vessel.

13. Bahamas, in anticipation of the arrival of the Glenrock and in contemplation of the sale, arranged a charter party with Interamerican Shipping Co. The Charter Party Agreement was executed on February 11, 1966 by Bahamas Line, S.A., "Owner's Agents", but the vessel did not sail from Miami pursuant to that Agreement until February 22, 1966.

14. During the interim between her arrival in Miami and her departure pursuant to said Charter Party Agreement, certain work, materials and services were furnished to the Glenrock by Diaz. His interest in and relationship to Tropic, for whom Bahamas was to purchase the Glenrock, is set forth above.

15. To the extent that Diaz incurred expenditures in furnishing supplies, materials and services to the Glenrock prior to her departure in performance of the Charter Party Agreement, Diaz acted as a prospective owner of the vessel and was

acting without the authority or approval of the owner, Hudson. Rogelio Jhones, in purportedly authorizing repairs, services or supplies to said vessel, acted beyond the scope of the limited authority delineated in the letter of February 17, 1966. This limited authority was disclosed to or should have been known by Diaz.

16. At the outset of the voyage from Miami, pursuant to the Charter Party Agreement negotiated by Bahamas with Interamerican Shipping Co., the vessel broke down. Charges and expenses were incurred in towing the vessel back to port and in making incidental repairs to damages manifested in said voyage. However, the Court is unable to separate those expenses, charges or materials furnished for the repair of the damage to the vessel on that voyage from various other repair, maintenance or conversion items furnished to said vessel by Bahamas and Diaz.

17. The Court finds it difficult to believe, and therefore it rejects the testimony of Bahamas and Diaz to the effect that substantial sums of money were furnished to the Glenrock by way of services, repairs and supplies on the credit of the vessel or the credit of her owner, Hudson. The Court's finding is made in view of the knowledge both Bahamas and Diaz had of the financial inability of Hudson to satisfy the vessel's obligations in San Juan, Puerto Rico. They also were aware of the owner's inability to satisfy other claims outstanding against the vessel including the mortgage held by libelant. The Court, therefore, finds that Bahamas and Diaz were either acting as prospective owners in incurring the aforesaid expenses or as volunteers having no obligation or valid authorization to so incur expenses. If these expenses were incurred with the approval of Jhonar, they were not within the scope of authority of Jhonar to approve. They were therefore furnished voluntarily, or without authorization by the owner and are not chargeable to the vessel.

## CONCLUSIONS OF LAW

Having made the foregoing Findings of Fact, the Court makes and enters the following Conclusions of Law:

1. The Court has jurisdiction over the parties to, and the subject matter of, this litigation.

2. Bahamas has a valid maritime lien to the extent of $3549.16, as the first priority holder of security, representing payment of that amount to the crew of the Glenrock for wages which accrued prior to the acceptance of the vessel at Miami by Bahamas on February 19, 1966, and of which assignments were obtained. Payment made to the master of the vessel for his services does not constitute a maritime lien. Walker v. Woolsey, 186 F.2d 920 (5th Cir. 1951); Burdine v. Walden, 91 F.2d 321 (5th Cir. 1937). Bahamas is also entitled to interest on the sums paid from the date of each payment. The remainder of the claim asserted by Bahamas does not constitute a maritime lien under Title 46, § 971 U.S.C.A. Rubin Iron Works, Inc. v. Johnson; Ruesga, et al. v. Johnson, 100 F.2d 871 (5th Cir. 1939).

3. Brewer has a valid maritime lien for the services and supplies furnished to the Glenrock within the confines of the United States in the sum of $15,754 and it is entitled to recover said amount with interest from November 16, 1965, after payment of the above maritime lien.

4. Freedom Line has a valid Panamanian Preferred Ship's Mortgage, and it is entitled to satisfaction of the unpaid balance thereof, including all sums and expenses secured by that instrument, after the above maritime liens have been satisfied, to the extent funds are available.

5. Diaz is not entitled to a maritime lien under Title 46, § 971, U.S.C.A.

6. Libelant is directed to prepare and submit Final Judgment in conformity with these Findings of Fact and Conclusions of Law within ten days.